# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER F0R ENVIRONMENTAL HEALTH and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY )<br><br>Plaintiffs,<br><br>vs.<br><br>MICHAEL REGAN, as Administrator of the United States Environmental Protection Agency, and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Defendants.<br>. | )<br>)<br>)<br>)<br>)   Civil Action No. 24-2194<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Robert M. Sussman
SUSSMAN & ASSOCIATES
3101 Garfield Street, NW
Washington, DC 20008
(202) 716-011

Paula Dinerstein
Colleen Tuebner
PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY
962 Wayne Avenue,
Suite 610
Silver Spring, MD 20910
(202-265-7337)

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………1

STATEMENT OF THE CASE………………………………………………………...4

    A.  Overview of TSCA…………………………………………………………………4

    B.  Formation of PFAS During Fluorination…………………………………………..7

    C.  The Threat of PFOA and Other PFAS to Public Health…………………………...9

    D.  EPA Half-Measures and Delays in Addressing PFAS Formation During Fluorination….12

    E.  Filing of Inhance SNUNs and EPA Action to Prohibit Fluorination……………….13

    F.  Invalidation of the EPA Order by the Fifth Circuit………………………………15

    G.  Section 21 Petition for Rulemaking on Fluorination…………………………...…15

STANDARD OF REVIEW…………………………………………………………16

ARGUMENT…………………………………………………………………………… 18

I.  Section 4(f) of TSCA Creates a Non-Discretionary Duty that is Judicially Enforceable under Section 20(a)(2)…………………………………………………………………18

II.  EPA's Limited and Non-Committal Response to Plaintiffs' Section 21 Petition Fell Short of Discharging EPA's Mandatory Duty under Section 4(f) and Therefore this Case is Not Moot………………………………………………………………………..19

    A.  Sections 21 and 4(f) Impose Different Obligations on EPA, Have Different Requirements and Serve Different Purposes……………………………………………………19

    B.  EPA's Section 21 Petition Response and Follow-up Information Request Were Insufficient to Comply with Section 4(f)…………………………………………………..21

    C.  While EPA May Have Some Discretion in Carrying Out its 4(f) Obligations, the Court's Remedy Must Be Sufficiently Prescriptive to Assure that EPA Fulfills the Requirements of Section 4(f)…………………………………………………………25

III.  Because Plaintiffs' Complaint Alleges that Fluorination Meets the TSCA Definition of Imminent Hazard, it Provides a Basis to Conclude that EPA Had a Mandatory Duty to File a Section 7 Action Against Inhance……………………………………………...27

CONCLUSION…………………………………………………………………………30

## INTRODUCTION

Plaintiffs Center for Environmental Health ("CEH") and Public Employees for Environmental Responsibility ("PEER") are non-profit organizations dedicated to protecting the public from environmental and health threats and promoting a high standard of environmental ethics, scientific integrity, and legal accountability within industry and government agencies. They file this Memorandum in opposition to the September 27, 2024 motion to dismiss of defendant U.S. Environmental Protection Agency ("EPA"). ECF 14.

This case involves EPA's failure to carry out its duties under section 4(f) of the Toxic Substances Control Act ("TSCA"), the nation's principal law for managing risks from chemicals. Section 4(f) is an action-forcing provision that requires expedited measures to protect the public from unusually urgent and dangerous risks to human health.  Here, the chemical presenting these risks is perfluorooctanoic acid ("PFOA"), likely the most harmful of the class of per- and poly-fluoroalkyl substances ("PFAS"), a family of chemicals that are ubiquitous in the environment and human blood and have raised widespread health concerns in the US and around the world.

As recognized by EPA, PFOA and other PFAS have been consistently found in plastic containers subjected to fluorination, a process of Inhance Technologies LLC ("Inhance") known to form multiple PFAS. According to EPA, these PFAS leach into the container contents and place exposed people at risk of cancer and other serious harms even when present in minute amounts. Approximately 200 million containers are fluorinated each year, and they are distributed throughout the economy, exposing millions of consumers, workers and communities to PFOA and 12 other PFAS.

In its motion to dismiss, EPA does not (and could not) dispute that the facts alleged in plaintiffs' Complaint establish that the Agency had a "reasonable basis to conclude" that the

formation of PFOA during fluorination "presents a significant risk of serious or widespread harm to human beings," the trigger for action under section 4(f). Nor can EPA dispute that, based on the accumulation of evidence during its lengthy investigation of fluorination, the Agency had a non-discretionary duty to address this risk under section 4(f) by early 2023 if not before.  Here too, the plain language of TSCA is unambiguous.  Section 4(f) provides that EPA "shall" initiate action to "prevent or reduce to a sufficient extent" risks to health from chemicals meeting the 4(f) threshold. It further requires that these actions must be taken within 180 days of receiving information triggering section 4(f). This non-discretionary duty and deadline are enforceable by this Court under the plain language of TSCA's citizens suit provision, section 20(a)(2).

EPA, however, argues that this case is moot because plaintiffs have received all the relief to which they are entitled under section 4(f). EPA Mot. at 10-13. It relies on two short documents responding to a petition filed in April by plaintiffs and other groups under section 21 of TSCA. The petition (attached as Exhibit 1) asked EPA to promulgate a section 6(a) rule banning PFAS formation during fluorination. Its goal was to fill the regulatory void created by the Fifth Circuit's March 21, 2024 decision overturning EPA's December 1, 2023 order under TSCA section 5(f), which prohibited Inhance from producing PFOA and two other PFAS when fluorinating containers.  *Inhance Technologies, LLC v. US Environmental Protection Agency,* 96 F.4th 888 (5th Cir. 2024).[1]  Despite EPA's "grant" of the petition, the two documents it now relies on fall far short of initiating actions to prevent or reduce risks of high concern as required by section 4(f).

---

[1] The Fifth Circuit decision was based on its conclusion that EPA had proceeded under the wrong provision of TSCA, one involving new uses of chemicals, to ban PFAS formation during fluorination. It did not question the scientific basis for the ban and even suggested that EPA could proceed under Section 6 of TSCA instead. 96 F.4th at 895.

The first, EPA's short July 20, 2024 letter "granting" the petition did not commit to the section 6(a) rulemaking that the petition requested. EPA only said that fluorination raised a "risk of concern," that it "will promptly commence an appropriate proceeding under TSCA Section 6," and that "[a]s part of that proceeding, the EPA intends to request information" about various aspects of fluorination. The letter (Exhibit A to EPA's motion) did not address the timetable for this "appropriate proceeding," commit to propose a section 6(a) rule, or specify the requirements such a rule might impose.

EPA's cursory September 30, 2024, Federal Register notice (89 Fed. Reg. 79581) did not further elaborate on the "appropriate proceeding" EPA was initiating. It merely described the section 21 petition, provided a boilerplate summary of relevant TSCA provisions, and requested feedback on three questions that EPA claimed were "necessary to inform the Agency's path forward . . . under TSCA section 6." 89 Fed. Reg. at 79583.  Nowhere did the notice explain the scope and timetable of the "proceeding" or what a section 6(a) rule for fluorination might accomplish. Moreover, the three EPA questions only touched on narrow, largely economic issues that were tangential to the rationale for a section 6(a) rule.  EPA did not seek feedback on the core issue under section 6: whether the serious health effects of PFAS formed during fluorination and their widespread distribution and use warranted a prohibition on fluorination, as EPA's vacated section 5(f) order had required.  Indeed, the three questions were themselves superfluous because, as explained in the declaration of PEER's science director Kyla Bennett (attached as Exhibit 2), EPA already knew the answers from its comprehensive four-year investigation of fluorination and the extensive information submitted by Inhance.

In sum, EPA's July 20, 2024 letter and September 30, 2024 Federal Register notice merely promise an undefined future proceeding with no goals or timetable. Section 4(f) demands more:

EPA was obligated to propose a section 6 rule that will "prevent or reduce [the fluorination risk] to a sufficient extent" by the section 4(f) deadline, which, as plaintiffs explain in their Complaint, has long passed. Because plaintiffs' Complaint plausibly alleges that EPA has not fulfilled its non-discretionary duties under section 4(f), this case is not moot and EPA's motion to dismiss should be denied.

EPA's motion also seeks dismissal of plaintiffs' separate claim that section 7 of TSCA imposes an enforceable duty on EPA to bring an "imminent hazard" case against Inhance in district court. However, both the text of sections 7 and 20(b)(2) and TSCA's legislative history confirm that EPA has a non-discretionary duty to file such a suit if: (1) the chemical at issue meets the definition of "imminently hazardous chemical substance" in section 7(f); and (2) EPA has not issued an "immediately effective" section 6(a) rule addressing the chemical's risks. Based on the allegations in plaintiffs' Complaint, both of these conditions have been met here. Accordingly, EPA's claim that the Complaint fails to allege violation of a non-discretionary duty under section 7 must be rejected.

## STATEMENT OF THE CASE[2]

### A.  Overview of TSCA

"Congress enacted TSCA in 1976 with the express purpose of limiting the public health and environmental risks associated with exposure to . . . toxic chemical substances." *Physicians Comm. For Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006). Disappointed in EPA's slow progress in implementing the law, Congress overhauled and strengthened TSCA in

---

[2] The factual information in this Statement is based on the allegations in plaintiffs' Complaint, the attachments to this brief and official EPA documents, all of which are appropriately referenced. This comports with the established principle that motions to dismiss for lack of subject-matter jurisdiction must assume that the Complaint's allegations are true and correct and demonstrate that the Complaint nonetheless fails to state a cognizable claim.

2016 with overwhelming bi-partisan support. These amendments enhance the core chemical regulatory authorities in TSCA by accelerating the pace of EPA risk evaluation and risk management and strengthening health and environmental protections against exposure to unsafe chemicals. To that end, the new law contains several specific directives to the Agency absent from the original law and imposes several new deadlines for completing these assigned tasks.

Key provisions of amended TSCA relevant to this case include:

- **Section 5,** 15 U.S.C. §2604, authorizes the review and regulation of new chemical substances and significant new uses of existing chemicals before they enter commercial production. Under the 2016 amendments, EPA must make an affirmative determination of safety under section 5(a)(3) for these chemicals and uses before they enter commerce. EPA cannot consider "costs and other non-risk factors" when making these determinations and regulating unsafe chemicals or uses. If EPA finds that a new chemical or use presents an unreasonable risk of injury, it *"shall"* issue an order under section 5(f) banning or restricting production to the extent necessary to protect against the unreasonable risk (emphasis added).

- **Section 6,** 15 U.S.C. §2605, requires EPA to conduct rulemaking on existing chemicals determined to present unreasonable risks of injury to health or the environment. Like section 5, section 6(b) directs that "costs and other nonrisk factors" cannot be considered when making determinations of unreasonable risk. Section 6(a) provides that, "[i]f the [EPA] Administrator determines . . . that the . . . use . . . of a chemical substance . . . presents an unreasonable risk of injury to health or the environment, the Administrator *shall* by rule" impose one of more of the restrictions authorized in sections 6(a)(1)-(7). 15 U.S.C. § 2605(a)(1)-(7) (emphasis added).

These restrictions may include prohibitions or limitations on manufacture, processing, use, distribution and/or disposal. Section 6(a) directs that the restrictions chosen by EPA must assure that the substance "no longer presents such [unreasonable] risk" – again without regard to cost or other economic considerations.[3] Finally, section 6(c)(1) prescribes a timetable for risk management rulemakings: EPA "*shall propose*" a section 6(a) rule within one year of completing its evaluation of unreasonable risks and "*shall publish* . . . a final rule not later than 2 years after" finalizing that risk evaluation (emphasis added).

- **Section 7(a)(2),** 15 U.S.C. §2606(a)(2) provides that, if EPA has not promulgated an immediately effective rule under section 6(d)(3), it "*shall*" commence a suit for immediate injunctive relief where the substance or mixture subject to the rule is "imminently hazardous" (emphasis added). Under section 7(f), the term "imminently hazardous" refers to a chemical which "presents an imminent and unreasonable risk of serious or widespread injury to health or the environment, without consideration of costs or other nonrisk factors."

- **Section 4(f),** 15 U.S.C. §2603(f), is intended to force EPA to act promptly to prevent or reduce urgent and serious or widespread risks of harm to people from unusually dangerous chemicals. Included in the original law, the 2016 amendments broaden the range of human health effects to which section 4(f) applies.[4] Regulatory action under the section is triggered when information available to EPA "indicates to [the Agency]

---

[3] Under section 6(c)(2), EPA must evaluate these factors during its rulemaking but they cannot override either its determination of unreasonable risk or its obligation to impose requirements that fully protect against that risk

[4] Under the original law, section 4(f) only applied to "cancer, gene mutations and birth defects." The 2016 amendments expanded its scope to all "harm to human beings."

that there may be a reasonable basis to conclude that a chemical substance or mixture presents a significant risk of serious or widespread harm to human beings." Upon acquiring such information, EPA "*shall . . .* initiate applicable action under section [5, 6 or 7] to prevent or reduce such risk to a sufficient extent" or determine that the risk is "not unreasonable" (emphasis added). Such action must be taken "within the 180-day period beginning on the date of the receipt of the information."

- **Section 20(a)(2),** 15 U.S.C. §2619(a)(2), authorizes citizens' civil actions to compel the Administrator "to perform any act or duty under this Act which is not discretionary."

- **Section 21,** 15 U.S.C. §2620, authorizes citizens to petition EPA to issue rules or orders under sections 4, 5, 6 and 8 of TSCA. EPA must respond to these petitions in 90 days. If it "grants" the petition, the Agency must "promptly commence an appropriate proceeding." The law does not define the nature of this "appropriate proceeding" or prescribe a timetable for its initiation.

### B.  Formation of PFAS During Fluorination

Inhance's business is treating high-density polyethylene ("HDPE") and other plastic containers by post-mold "fluorination," a process in which fluorine gas is applied to the molded container under high temperatures to improve its barrier properties (i.e., its impermeability). Plaintiffs' Complaint (ECF 1) ¶52. After molding the plastic resin into a fixed size and shape, container manufacturers ship them to Inhance facilities to be fluorinated. The fluorinated containers are then sent to distributors or product suppliers who add the container contents and ship the filled containers to downstream users. Inhance fluorinates approximately 200 million containers per year. Pl. Com.  ¶53.

Containers fluorinated by Inhance are widely used for a variety of consumer, commercial and industrial products. Examples include household spray cleaners, countertop polish, floor cleaners and polish, furniture wipes, spray pesticides and herbicides, hose-end sprayer herbicides, commercial pesticides, cosmetics, food packaging and industrial chemical storage. Id. ¶54.  Inhance also fluorinates fuel tanks for handheld and ground-supported outdoor power equipment (e.g., mowers, string trimmers), power sports (e.g., all-terrain vehicles, personal watercraft, 4x4s), vessels (e.g., motorized boats), and portable fuel storage containers (e.g., gas cans). Id. ¶55; Declaration of Kyla Bennett ¶¶ 18-21.

In the fall of 2020, plaintiff PEER and Massachusetts Department of Environmental Protection ("MADEP") tested fluorinated containers of Anvil 10+10®, a pesticide used for mosquito control, and detected the presence of multiple PFAS, including PFOA.  Pl. Com.¶58; Bennett Declaration ¶¶4-5.  In December 2020, EPA tested unused fluorinated containers obtained from the distributor of Anvil 10+10® and detected these PFAS in the rinsates (solvents used to extract chemical compounds). Pl. Com. ¶¶59-60.  On January 14, 2021, EPA issued a press release "making new information available about EPA testing that shows PFAS contamination from fluorinated containers." Id. ¶61.

In early 2021, EPA issued the first of two subpoenas to Inhance to investigate whether it was in violation of EPA's 2020 Significant New Use Rule ("SNUR") under TSCA section 5(a)(2) for certain long-chain PFAS. Over the ensuing months, id. ¶71, EPA conducted two additional rounds of testing confirming formation of 13 different PFAS in fluorinated containers. Id. ¶¶ 62-63. Similar results were reported by several academic researchers and independent testing laboratories. Id. ¶64.  In the aggregate, this growing body of data demonstrated that PFOA and several other PFAS were consistently found in the walls of fluorinated containers and

were shown to readily leach into the container contents and that, over time, the concentrations of PFAS in the containers and their contents increased. Id. ¶102-103; Bennett Dec. ¶5.  Inhance itself has admitted to EPA that the production of PFAS is "an apparently unavoidable aspect of fluorination of HDPE containers" and "there is no easy solution to the problem." Pl. Com. at ¶56.

### C.  The Threat of PFOA and Other PFAS to Public Health

EPA has recognized that "harmful per- and poly-fluoroalkyl substances ("PFAS") are an urgent public health and environmental issue facing communities across the United States."  As EPA has explained, "[d]ue to their strong carbon-fluorine bonds, many PFAS can be very persistent in the environment with degradation periods of years, decades, or longer under natural conditions." Often called "forever chemicals," PFAS "remain chemically and thermally stable, . . . making them resistant to hydrolysis, photolysis, microbial degradation, and metabolism. These properties are what make . . . some PFAS extremely persistent in the human body and the environment." *EPA PFAS National Primary Drinking Water Regulation Rulemaking,* 88 Fed. Reg. 18638, 18643 (March 29, 2023) (citations omitted).  PFAS have been detected in the blood of the general U.S. population, with 98 percent of those sampled showing detectable levels of these compounds. 88 Fed. Reg. 18643. PFAS are associated with "significant and diverse adverse health effects" that "include (but are not limited to): cancer and effects on the liver (*e.g.,* liver cell death), growth and development (*e.g.,* low birth weight), hormone levels, kidney, immune system, lipid levels (*e.g.,* high cholesterol), the nervous system, and reproduction." *Id.*

PFOA, which is consistently formed during fluorination, is likely the most dangerous PFAS for which health effects data are available. In 1999, responding to concerns about its persistence and accumulation in human blood and wildlife, 3M Corporation, the largest manufacturer of PFOA, announced that it was halting the chemical's manufacture and use. Pl.

Com. ¶83. Shortly thereafter, PFOA was implicated in large-scale contamination of drinking water near a DuPont facility in West Virginia. Follow-up studies funded by the company as part of a legal settlement demonstrated links to cancer and a host of other health problems in the exposed population. Id. ¶84.  On September 27, 2002, the then-Director of the EPA Office of Pollution Prevention and Toxics wrote a memo stating that, "The reproductive/developmental toxicity data, the carcinogenicity data, and the blood monitoring data reviewed in the interim revised hazard assessment raise the possibility that PFOA might meet the criteria for action under section 4(f) of the Toxic Substances Control Act." Id. ¶85-86.

In 2006, under pressure from EPA, the principal manufacturers and processors of PFOA and similar long-chain PFAS formed a PFOA Stewardship Program with a goal of reducing and then eliminating their manufacture, use and environmental release by 2015.  80 Fed. Reg. 2885, 2888 (January 21, 2015). The producers fulfilled these commitments, ceasing production of PFOA by the end of 2015.  EPA then sought to formalize this phase out by proposing a SNUR to prevent "resumption of past uses" of PFOA and other long-chain PFAS which "could increase the magnitude and duration of exposure to humans and the environment." 80 Fed. Reg. at 2890. The Agency supplemented the proposal on March 3, 2020 (85 Fed. Reg. 12479) and finalized the SNUR on July 27, 2020 (85 Fed. Reg. 45109).

The SNUR emphasized that "PFOA is persistent, widely present in humans and the environment, has a half-life in humans of 2.3–3.8 years, and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity." 85 Fed. Reg. at 35113. According to the SNUR, "[h]uman epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney)." Id.

Although EPA had been concerned by the harmful effects of PFOA since the early 2000s, the Biden Administration reevaluated the PFOA data-base in order to inform regulation of PFAS under laws governing the cleanup of contaminated waste sites and protection of drinking water. EPA selected PFOA as one of six PFAS for which it developed National Primary Drinking Water Regulations ("NPDWRs") under the Safe Drinking Water Act ("SDWA").[5] The proposed regulations, published on March 29, 2023, stated: "Following a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA … [is] likely to cause cancer (*e.g.,* kidney and liver cancer) and that there is no dose below which … [it] is considered safe." 88 Fed. Reg. at 18639.  EPA accordingly proposed to set the health-based value, or the Maximum Contaminant Level Goal ("MCLG"), at zero. Id. at 18639. EPA's final drinking water regulations, promulgated on April 26, 2024, reiterated that PFOA is "*Likely to be Carcinogenic to Humans* based on sufficient evidence of carcinogenicity in humans and animals" and "that there is no known threshold for carcinogenicity." 89 Fed. Reg. 32532 (emphasis in original). The final regulations finalized an MCLG of zero, emphasizing that there was no level of exposure at which "known or anticipated adverse effects on the health of persons" do not occur.

EPA also evaluated the non-cancer effects of PFOA, concluding that "the available evidence indicates there are effects across immune, developmental, cardiovascular, and hepatic organ systems at the same or approximately the same level of PFOA exposure." 88 Fed. Reg. at 8659. On this basis, it set 4.0 parts per trillion ("ppt") as the maximum contaminant limit ("MCL") for PFOA in drinking water, explaining that this minuscule level was as "close as feasible to the MCLG" of zero. 88 Fed. Reg. 18666-8.

---

[5] PFOA was also one of two PFAS that EPA listed as "hazardous substances" under the Superfund law. 89 Fed. Reg. 39124 (May 8, 2024); Pl. Com.  ¶91.

### D.  EPA Half-Measures and Delays in Addressing PFAS Formation During Fluorination

During the four years following its discovery of PFAS in fluorinated containers, EPA addressed this serious threat to public health in fits and starts, with long periods of inaction and half-hearted efforts to enforce the SNUR that failed to stop Inhance from producing harmful PFAS.

The 2020 EPA SNUR definition of "significant new use" encompassed production of PFOA and other long-chain PFAS during fluorination.[6]  Under section 5(a)(1)(B) of TSCA, persons subject to a SNUR are required to submit significant new use notices ("SNUNs") to EPA at least 90 days before the anticipated commencement of manufacture. The law prohibits manufacture from proceeding until EPA has conducted a review of the notice, made a risk determination for the proposed new use and issued an order under section 5(e) or 5(f) restricting the use if warranted by the risk.

 Because Inhance had never submitted SNUNs and was continuing to produce PFAS subject to the SNUR, EPA issued a Notice of Violation ("NOV") to the company on March 1, 2022 determining that its PFAS formation during fluorination was a violation of TSCA. Pl. Com. ¶¶68-69. The NOV stated that unless Inhance could change its process to stop manufacture of these PFAS, it had to immediately cease fluorination and could not resume until it had submitted SNUNs and EPA had completed reviewing them and taking follow-up action.

Inhance refused to comply with the NOV's demands and continued forming PFAS during fluorination. Id. ¶70. However, EPA did not follow-up with an enforcement action and, on October 21, 2022, PEER and CEH notified the Agency of their intent to file a citizens'

---

[6] The company could have sought an exemption from the rule in recognition of its preexisting use of the fluorination process but failed to do so.  During the rulemaking, EPA specifically asked industry to identify preexisting uses that qualified for exemptions, but Inhance failed to respond. 85 Fed. Reg. at 45118.

enforcement case against Inhance under TSCA section 20(a)(1). Prodded by plaintiffs' impending suit, EPA belatedly brought an enforcement action against Inhance in the Eastern District of Pennsylvania on December 19, 2022. *United States v. Inhance Techs. LLC,* No. 22-5055 (E.D. Pa.). Plaintiffs filed their own action in this Court[7] but EPA sought dismissal, invoking section 20(b)(2)'s bar on citizens enforcement where the Government is "diligently prosecuting" its own case. This Court agreed that the bar applied but dismissed plaintiffs' suit without prejudice, leaving the door open to refiling if the Government did not diligently pursue its case going forward. *Center For Environmental Health v Inhance Technologies*, No. 22-3819 (JEB) (D.D.C. April 6, 2023), 2023 WL 2808710.

Unfortunately, that is exactly what happened. While plaintiffs intervened in the Eastern District of Pennsylvania case and moved for summary judgment and an injunction, the Government did not join in these efforts. Instead, it filed but withdrew a limited summary judgment motion on liability, sought repeated delays in the case, and ultimately filed a notice of voluntary dismissal two years after the case was brought.

The result was that, nearly two and a half years after EPA issued the NOV, Inhance continued to produce PFOA and other PFAS during fluorination and is still doing so today.

### E.  Filing of Inhance SNUNs and EPA Action to Prohibit Fluorination

On December 30, 2022, Inhance belatedly filed SNUNs under protest for the manufacture of PFOA and eight other PFAS during the fluorination process.  Id. at ¶70; 88 Fed. Reg. 10320 (February 17, 2023).  The SNUNs contained voluminous information and data on fluorination and the distribution and use of fluorinated containers. Inhance later supplemented the SNUNs in response to information requests from the Agency. Pl. Com. at ¶71.

---

[7] Plaintiffs had to wait to file suit for 60 days after their notice of intent to sue under section 20(b)(1)(A) of TSCA and December 26, 2022 was the earliest day suit could be filed.

EPA's review of the SNUNs and other relevant information culminated in issuance of a December 1, 2023 order to Inhance under TSCA section 5(f) that was supported by a comprehensive risk assessment. Id. at ¶73-74. The section 5(f) order applied to PFOA and two other long-chain PFAS known to cause harmful health effects. It determined under TSCA section 5(a)(3)(A) that "manufacture, processing, distribution in commerce, use, and disposal [of these PFAS] . . . presents an unreasonable risk of injury to health or the environment."[8] Id. at ¶103-106. Based on this determination, the order prohibited production of the three PFAS during fluorination and banned the processing, distribution in commerce, use and disposal of fluorinated containers in which these PFAS were present.

> The EPA risk assessment supporting the order determines that:
>
> "[b]ecause of the persistent and bioaccumulative nature of these PFAS, exposure to each SNUN Chemical Substance will continue over time, long after the immediate exposure associated with their use;" "the identified hazards of PFOA are so significant that there are no safe levels of exposure;" and extensive exposure and environmental release are the inevitable "result of leaching or migration of [LCPFACs] from fluorinated, plastic storage containers over time into" numerous consumer and industrial products.

Id. at ¶76, Thus, the order concludes that EPA "cannot control potential exposures to the SNUN Chemical Substances through means other than a prohibition on the manufacture of these substances." As EPA elaborated, "[g]iven the diverse uses of the products contained in these fluorinated containers, and the fact that leaching can occur throughout the lifecycle of the fluorinated containers, EPA cannot realistically set limits on

---

[8] Because its section 5(f) order determined that PFOA formation during fluorination presents an unreasonable risk, EPA lacks any basis to find that the risks it presents are "not unreasonable" under section 4(f), leaving the Agency with the options of initiating rulemaking under section 6, filing an imminent hazard action under section 7 or both.

releases to water, air, and/or land, or mitigate worker, consumer, and general population exposures . . . [and] prevent the PFOA contamination . . . other than prohibiting the PFOA from being manufactured in the first place." Id.

### F.  Invalidation of the EPA Order by the Fifth Circuit

The EPA order would have become effective on February 28, 2024 but was stayed by the Fifth Circuit Court of Appeals on December 12, 2023 and vacated in its March 2, 2024 decision.  *Inhance Technologies, LLC v. US Environmental Protection Agency,* 96 F.4th 888 (5th Cir. 2024). In the decision, the Court held that, because Inhance was fluorinating containers before proposal of the SNUR in 2015, its fluorination process could not be designated as a "significant new use" under TSCA Section 5 and EPA therefore lacked authority to issue the order.[9]  96 Fed.4th at 892-95. In so ruling, the Fifth Circuit declined to reach the merits of Inhance's challenges to the scientific and evidentiary basis for the EPA order and thus did not cast any doubt on the validity of EPA's unreasonable risk determination. The court also "hasten[ed] to add" that EPA could "properly proceed" to regulate the fluorination process under Section 6 of TSCA. Id.at 895.

### G.  Section 21 Petition for Rulemaking on Fluorination

Concerned that the Fifth Circuit decision blocked action to abate the serious health threat of fluorinated containers, plaintiffs and five other groups filed a petition under section 21 of TSCA on April 11, 2024 seeking rulemaking under section 6.  (The petition is attached as Exhibit 1.)  The petition emphasized that EPA's section 5(f) order and supporting risk assessment had already determined that PFOA and two other  PFAS presented an unreasonable risk to health and found

---

[9] EPA did not seek rehearing or Supreme Court review of the Fifth Circuit decision. Plaintiffs do not endorse  the logic or outcome of the decision but recognize that it effectively bars EPA from regulating fluorinated containers under TSCA Section 5.

that only a prohibition on PFAS formation during fluorination could prevent harmful exposure to the three PFAS. The petition asked EPA to promptly propose a rule under section 6(a) imposing such a prohibition and make that rule immediately effective on proposal under section 6(d)(3)(A).

EPA responded to the petition in a letter dated July 20, 2024. (EPA Mot. Exhibit A).  While purporting to "grant" it, EPA made no commitment to propose a section 6(a) rule on fluorinated containers and did not set a schedule for further action. Instead, noting that PFAS in fluorinated containers presented a "risk of concern," it agreed only to "promptly commence an appropriate proceeding under TSCA Section 6" and provided no details on that "proceeding" beyond its intent "to request information."

EPA followed up on September 30, 2024 with a short Federal Register notice requesting information on a small number of questions relating to fluorinated containers. 89 Fed. Reg. 79581. As demonstrated in the attached Bennett declaration (Exhibit 2), the requested information is already in EPA's possession as a result of the voluminous Inhance SNUNs, additional submissions by the company and others, and EPA's own extensive research and analysis during its four-year investigation of fluorinated containers.

## STANDARD OF REVIEW

A motion to dismiss for lack of jurisdiction challenges the court's power to hear the case. There is jurisdiction when "the complaint will be sustained if the  . . . laws of the United States are given one construction and will be defeated if they are given another." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (internal quotation omitted). "[A] federal court's power to hear a case . . . is generally conferred by the basic statutory grants of subject matter jurisdiction, such as 28 U.S.C. § 1331 [federal question jurisdiction] . . .If a plaintiff invoking §1331 pleads a colorable claim arising under the Constitution or laws of the United States, . . . he

invokes federal subject matter jurisdiction, and deficiencies of the claim should be addressed by the other mechanisms provided by the federal rules." *Holloway v. Pagan River Dockside Seafood*, 669 F.3d 448, 453 (4th Cir. 2012) (internal citation omitted).

When deciding a motion to dismiss, the Court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

Here the complaint pleads a colorable claim under the laws of the United States, specifically TSCA, and EPA does not argue otherwise. Its sole basis for claiming a lack of jurisdiction is mootness. A defendant bears the burden to demonstrate mootness, and "[t]he burden is a heavy one." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). EPA has not met that burden. Under Article III, Section 2 of the Constitution, this Court's power "depends on the existence of a case or controversy." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975).  "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 469 (1969)). Indeed, a case is only moot if the court is unable to grant "any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citations and quotation marks omitted; emphasis added).

As shown below, construed in favor of plaintiffs, the allegations in their Complaint plainly establish that EPA violated its non-discretionary duty under section 4(f) of TSCA. They also show beyond dispute that EPA's recent actions fail to remedy that violation and there is an

ongoing "case or controversy" over EPA's non-compliance with section 4(f) that precludes a finding of mootness.

## ARGUMENT

**I. Section 4(f) of TSCA Creates a Non-Discretionary Duty that is Judicially Enforceable under Section 20(a)(2)**

Section 20(a)(2) of TSCA, 15 U.S.C. §2619(a)(2), provides that "any person may commence a civil action . . . against the Administrator to perform any act or duty under this Act which is not discretionary." A statute imposes a nondiscretionary duty if it "'categorically mandate[s]' that all specified action be taken by a date-certain deadline." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987). "[W]here Congress . . . has clearly evinced its intent to fashion a binding deadline, courts are more inclined to deem it *mandatory." Kelso v. U.S. Dept. of State,* 13 F.Supp.2d 12, 15 (D.D.C. 1998) (emphasis in original).

Section 4(f) is such a mandate: it unequivocally states that EPA "*shall . . .* initiate applicable action under section [5, 6 or 7]" when it obtains information indicating "that there may be a reasonable basis to conclude that a chemical substance or mixture presents a significant risk of serious or widespread harm to human beings" (emphasis added). Section 4(f) also imposes a mandatory deadline on EPA: it must initiate action to prevent or reduce the risk "within the 180-day period beginning on the date of the receipt of such information."

"Ordinarily, legislation using 'shall' indicates a mandatory duty." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016); *United States v. Monsanto,* 491 U.S. 600, 607 (1989) (by using "shall" in a statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *Pierce v. Underwood,* 487 U.S. 552, 569–70, (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language.")

The use of "shall" coupled with an explicit deadline for EPA action leave no doubt that section 4(f) creates a "duty under [TSCA] which is not discretionary" and therefore is enforceable against the Agency in a suit under section 20(a)(2).

Plaintiffs have also met the precondition in section 20(b)(2) for filing a citizens' suit to compel EPA to perform its statutory obligations:  they gave "notice to [EPA] of the alleged failure . . . to perform [the] act or duty" which they seek to enforce over 60 days before filing their Complaint.[10]

## II.   EPA's Limited and Non-Committal Response to Plaintiffs' Section 21 Petition Fell Short of Discharging EPA's Mandatory Duty under Section 4(f) and Therefore this Case is Not Moot

### A.   Sections 21 and 4(f) Impose Different Obligations on EPA, Have Different Requirements and Serve Different Purposes

EPA's only basis for dismissing this case is that it has in fact discharged its obligations under section 4(f) and plaintiffs have received all the relief to which they are entitled. EPA Mot. at 11-13. This argument is premised on two short documents issued by the Agency: (1) a July 20, 2024 letter responding to plaintiffs' petition under section 21 of TSCA seeking section 6(a) rulemaking on fluorinated containers; and (2) a September 30, 2024 Federal Register notice (89 Fed. Reg. 79582) following up on the letter and requesting information on a small number of issues EPA deemed relevant to that rulemaking.

---

[10] On May 17, 2024, CEH and PEER notified defendants by letter that they intended to file suit under section 20(a)(2) to challenge EPA's failure to perform its non-discretionary duty under section 4(f) of TSCA to initiate applicable action under section 5, 6 or 7 to prevent or reduce the risk posed by PFOA formed during the fluorination of plastic containers. The notice letter stated that EPA received information triggering section 4(f) by March 29, 2023, if not earlier, and that the mandatory 180-day period for initiating action to prevent or reduce the risk or determining it was not unreasonable expired on or before September 25, 2023. Plaintiffs filed their Complaint on July 25, 2024.

This argument erroneously conflates two TSCA provisions – section 21 and section 4(f) – which play different roles in the TSCA scheme and differ markedly in their language and purposes. To equate a preliminary and limited information request in response to a section 21 petition with section 4(f)'s requirement for expeditious action to prevent or reduce risks of high concern would make a mockery of section 4(f) and enable EPA to ignore it at will.

### 1. Section 21

Section 21(a), 15 U.S.C. §2620(a), authorizes citizens to file petitions seeking issuance, amendment or repeal of a rule or order under the major TSCA provisions: sections 4, 5,6 and 8. Under section 21(b)(3), EPA must "grant or deny" petitions in 90 days. Section 21(b)(4) provides a judicial remedy for petition denials but not for grants. When it grants a petition, section 21(b)(3) directs that EPA "shall promptly commence an appropriate proceeding." However, no timetable is provided for this "appropriate proceeding" and there is no indication of the steps EPA must take during that proceeding or its scope and objectives. A recent appellate court decision in another circuit holds that, when "granting" a petition, EPA need not take the actions requested by the petitioner but has considerable discretion over how the goals of the petition should be met and what specific tools in the law should be used to achieve them. *Center for Environmental Health*, 103 F.4th 1027, 1030, 1038-39 (4th Cir. 2024).

### 2. Section 4(f)

Section 4(f), by contrast, requires EPA to give immediate attention to risks to human health of great concern.  According to EPA, the "purpose of section 4(f) is to focus the Agency's attention on chemicals that pose potentially high risks to people from [serious health effects] by setting a 180-day deadline [to] ensure that Agency resources will be immediately devoted to assessing whether action should be initiated to prevent or control the risks."  49 Fed. Reg. 21870

(May 23, 1984).  As EPA elaborated, "[w]hile the terms 'significant risk of serious harm' and 'significant risk of widespread harm' are not defined by TSCA, the language of the statute indicates that both standards reflect attempts to define situations of apparent gravity." Id.

Rather than simply requiring EPA to commence "an appropriate proceeding," section 4(f) sets a specific deadline for initiating action – 180 days – and defines the nature of this action – to "prevent or reduce such risk to a sufficient extent" or determine it is "not unreasonable." As the conference report on the 1976 law emphasized, once the section 4(f) risk threshold is satisfied, "the Administrator shall initiate [applicable] action under section 5, 6, or 7 *to protect against the risk* or publish in the Federal Register a finding that the risk is not unreasonable". H.R. Report No. 94-1679, 94th Cong.2d Sess. (1976) at 62 (emphasis added).  In context, the phrase "initiate applicable action" plainly means more than collecting information. Instead, it connotes concrete and effective measures to eliminate or mitigate a risk to human health that is "significant and serious or widespread."

For example, where EPA decides to meet its section 4(f) responsibilities by addressing the risk under section 6, the "applicable action" would be rulemaking under section 6(a) and the first step would be to "propose in the Federal Register a rule under subsection (a)."  TSCA section 6(c)(1), 15 U.S.C. § 2505(c)(1).  Under section 6(c)(3), this proposal would need to be "in accordance with section 553 of" the Administrative Procedure Act ("APA") and thus would have to notify the public of "the time, place, and nature of public rule making proceedings"; "the legal authority under which the rule is proposed"; and "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C  § 553(b)(1)–(3); *Stringfellow Memorial Hospital v. Azar,* 317 F.Supp.3d 168 (D.D.C. 2018).

Upon receiving information meeting the 4(f) risk threshold, TSCA gave EPA 180 days to initiate action and permitted the Agency to extend that deadline by up to 90 days for "good cause shown."[11] A nine-month period for initiating action would have been unnecessary if EPA could discharge its obligations under section 4(f) merely by requesting additional information. Thus, the timetable provided by Congress strongly suggests that it expected EPA to propose a section 6 rule (or take equivalent steps under sections 5 or 7) to "prevent or reduce such risk to a sufficient extent" unless it determined that the risk was "not unreasonable."[12] By giving EPA up to nine months to respond to 4(f) information, Congress thus signified that it wanted the Agency to have enough time to propose meaningful and substantive risk abatement measures. Indeed, apart from section 4(f), TSCA section 6(c)(1) sets an expeditious one-year deadline for proposing a section 6(a) rule following a determination that a substance or mixture presents an unreasonable risk – a timeframe only 3 months longer than the one in section 4(f).[13]

## B. EPA's Section 21 Petition Response and Follow-up Information Request Were Insufficient to Comply with Section 4(f)

After the Fifth Circuit vacated EPA's section 5(f) order as exceeding its statutory authority, plaintiffs looked for alternative tools under TSCA to achieve the same outcome – to prohibit the formation of PFOA and other dangerous PFAS during the Inhance fluorination process. Plaintiffs

---

[11] Section 4(f) directs that EPA "shall publish in the Federal Register notice of any such extension and the reasons therefor."

[12] The phrase "to a sufficient extent" indicates that the action EPA takes must afford the level of protection required under the "applicable" TSCA provision. Under section 6(a), this means imposing restrictions that assure the substance "no longer presents such [unreasonable] risk" without regard to cost or other economic considerations. In its section 5(f) order, EPA concluded that only a prohibition on PFAS formation during fluorination would eliminate the unreasonable risk. This same approach would be required under section 6(a).

[13] The one year requirement in section 6(c)(1) is triggered by completion of a risk evaluation finding an unreasonable risk. Here, as described above, EPA issued such a risk assessment for PFAS production during fluorination under TSCA section 5 on December 1, 2023, over ten months ago. Since TSCA section 6(a) directs that EPA "shall" conduct rulemaking where EPA has made a determination of unreasonable risk, EPA would be required to propose a section 6(a) rule for fluorination on a fast track even apart from its obligation to do so under section 4(f).

turned to section 6 because the Fifth Circuit had not invalidated EPA's unreasonable risk determination under section 5 and had explicitly endorsed rulemaking under section 6(a) as a proper vehicle to regulate fluorination under TSCA. *Inhance Technologies, LLC v. EPA,* 96 F.4th at 895.   Accordingly, the section 21 petition filed by plaintiffs and five other non-profit groups on April 11, 2024 (Exhibit 1) asked EPA to promptly propose a rule under section 6(a) prohibiting formation of PFOA and two other PFAS during fluorination and to make that proposed rule immediately effective under section 6(d)(3)(A).[14]

EPA's brief July 20, 2024 letter "granting" the petition did not commit to undertake the section 6(a) rulemaking requested by the petition. Noting only that fluorination presents a "risk of concern," EPA said that it "will promptly commence an appropriate proceeding under TSCA Section 6" and "[a]s part of that proceeding . . .   request information" about various aspects of fluorination. The letter did not discuss the timetable for this "appropriate proceeding," whether it would consist of rulemaking or be terminated without a proposed rule, and what requirements EPA might impose. Thus, the letter did not come close to meeting EPA's obligation under section 4(f) to initiate action to "prevent or reduce [the] risk [of fluorination] to a sufficient extent." Since the Complaint alleges that the mandatory 180-day period to take such action began no later than March 29, 2023, and thus ended no later than September 25, 2023, it alleges that EPA has been and remains in violation of its non-discretionary duty under section 4(f). Pl. Com. ¶116.

EPA's terse September 30 Federal Register notice (89 Fed. Reg. 79581) also failed to satisfy section 4(f). The notice did not flesh out EPA's "appropriate proceeding" but merely described the section 21 petition, briefly summarized relevant TSCA provisions, and requested

---

[14] Plaintiffs 60-day section 4(f) notice was submitted on May 17, 2024, while the petition was still pending, to underscore the need for promptly proposing a section 6(a) rule based on the section 5(f) risk assessment and imposing the same remedy.

feedback on three questions.[15] EPA claimed that this information was "necessary to inform the Agency's path forward with respect to regulation of these PFAS formed during the fluorination of plastic containers under TSCA section 6." 89 Fed. Reg. at 79583.  However, none of the questions focused on whether the unique risk factors for PFOA and other PFAS – persistence, bioaccumulation in people and the environment, widespread exposure and serious adverse health effects at very low doses -- warranted a prohibition on PFAS formation, as EPA had already determined in its section 5(f) order and risk assessment. Instead, they touched on narrow, largely economic issues that EPA might need to analyze during its rulemaking but are tangential to the level of protection necessary under a section 6(a) rule.

Moreover, as the attached declaration of PEER's science director Kyla Bennett explains, EPA already knows the answers to the three questions because of the extensive SNUNs and other information submitted by Inhance.[16]  For example:

- In its submissions, Inhance informed EPA that it fluorinates approximately 200 million containers and other items each year, described in detail the uses of these containers and provided detailed breakdowns of its customers, their locations and volumes of containers fluorinated by region. Thus, EPA is already aware of the "[n]umber, location, and uses of fluorinated containers in the United States." Bennett Dec. at ¶¶ 17-23.
- EPA fully understands available "[a]lternatives to the fluorination process" as a result of its extensive interactions with Inhance, other providers of barrier protection technologies and container users. For example, EPA has received detailed information about BP Polymer's barrier protection products, which do not involve fluorine and do not form PFAS. In fact, EPA has issued two letters to pesticide formulators confirming that the BP technology is a safe and effective substitute for fluorination. Id. at ¶¶ 6-9, 24-25.
- EPA's section 5 program has already fully assessed "[m]easures to address risk from PFOA, PFNA, and PFDA formed during the fluorination of plastic containers." As its section 5(f) order and risk assessment discuss in detail, EPA rejected workplace protections, environmental release limits and restrictions as inadequate to prevent exposure to PFAS formed during

---

[15] The notice did not mention section 4f) even though EPA was in receipt of plaintiffs' 60-day notice letter under TSCA section 20(b)(2).

[16]  Since most of this information was claimed confidential by Inhance under TSCA and is being withheld by EPA, it would not be accessible to persons outside the Agency and they could not comment on it.

fluorination and fully explained why only a ban on PFAS formation would meet EPA's obligation to assure fluorination does not present an unreasonable risk to health. Id. at ¶¶ 26-27.

In short, relying on the extensive information it already possesses, EPA could have already published a proposed rule under section 6(a) if it had begun the rulemaking process immediately after the March 2 Fifth Circuit decision.[17] However, judging by EPA's July 20 letter and September 30 Federal Register notice, months if not years will pass before EPA's "appropriate proceeding" results in a proposed rule under section 6(a) -- and there is no guarantee that EPA will ever reach that stage. Section 4(f) was designed to avoid such open-ended and indefinite delays in protecting against unusually serious and immediate risks. But with EPA already in violation of the 4(f) deadlines and demonstrating no urgency about moving forward, only enforcement of its non-discretionary duties by this Court will spur the Agency to expeditiously prevent or reduce the risks of fluorination as section 4(f) demands.

### C. While EPA May Have Some Discretion in Carrying Out its 4(f) Obligations, the Court's Remedy Must Be Sufficiently Prescriptive to Assure that EPA Fulfills the Requirements of Section 4(f)

In its motion, EPA argues that it has unbridled discretion to determine what action will suffice to carry out a non-discretionary duty by a statutory deadline. EPA Mot. at 5, 12. It cites several decisions, including *Sierra Club v. Browner,* 130 F. Supp. 2d 78, 90 (D.D.C. 2001), which states that:

> *Under the [Clean Air Act or CAA], the Court can only order EPA to take nondiscretionary actions required by the statute itself....* Notably, the CAA does not allow

---

[17] Even if EPA felt it needed additional time for information collection, this would not excuse EPA's failure to meet the statutory deadline. "Courts also tend to reject as contrary to the relevant statute agency approaches to rulemaking that sacrifice the timely implementation of the statute in favor of extensive agency information-gathering and analysis. . . Courts also turn a skeptical eye towards agency claims that competing regulatory priorities preclude compliance with statutorily-mandated deadlines." *Sierra Club v. Johnson,* 444 F.Supp.2d 46, 53-54 (D.D.C. 2006).

district courts to address the content of EPA's conduct, issue substantive determinations of its own, or grant other forms of declaratory relief.... Accordingly, the Court shall not grant the declaratory relief that Sierra Club seeks, especially *since doing so would necessarily embroil the Court in an assessment of the substance of EPA's actions or omissions.* . . . [S]uch substantive judicial review is expressly reserved for the appropriate court of appeals. (Emphasis added).

EPA contorts these principles beyond recognition. The question before the Court is not whether EPA has discretion to make substantive policy and legal judgments that are outside the parameters of the non-discretionary duty imposed by Congress. It is whether the Court is powerless to order a remedy where the agency claims its actions are within its discretion but in fact fail to fulfil the obligations mandated by the statute.

That is the situation here. Were EPA to undertake a rulemaking under section 6(a) on fluorinated containers, it would have discretion over the precise restrictions imposed, the timeline for compliance, the availability of exemptions and other aspects of the rule. If plaintiffs disagreed with these decisions, their recourse would be through the judicial review process in section 19(a) of TSCA, not a citizen's enforcement action under section 20(a). But EPA seeks to use limited actions that plainly did not satisfy section 4(f) to evade accountability for doing what section 4(f) expressly requires -- to "initiate action . . . to prevent or reduce to a sufficient extent" the significant, serious and widespread risks presented by fluorinated containers.

Clearly, section 20(a) authorizes the Court to direct EPA to discharge these obligations, even if the specifics of any rule EPA ultimately promulgates may be within its policy discretion and reviewable in another forum. Court orders enforcing mandatory duties (including in the cases cited by EPA) have not just set compliance deadlines but specifically prescribed the actions the Agency must take to perform the non-discretionary duties it has failed to carry out. *E.g., Environmental Defense Fund v. E.P.A.,* 852 F.2d 1316, 1320-1321 (D.C. Cir. 1988); *Sierra Club v. Johnson,* 444 F.Supp.2d at 61; *Sierra Club v. Ruckelshaus,* 602 F. Supp. 892, 902 (N.D. Cal.

1984).  As in these cases, if this Court ultimately rules that EPA is in violation of section 4(f), the order it issues must be sufficiently prescriptive to assure that EPA fulfills the requirements of the statute by a date certain.  At the appropriate time, the specifics of that order can be addressed by the parties and the Court.[18]

### III.   Because Plaintiffs' Complaint Alleges that Fluorination Meets the TSCA Definition of Imminent Hazard, it Provides a Basis to Conclude that EPA Had a Mandatory Duty to File a Section 7 Action Against Inhance

EPA also seeks dismissal of plaintiffs' claim that it had a mandatory duty to file an action in federal court against Inhance under section 7 of TSCA because the Agency's assessment of the risks of fluorination demonstrated an "imminent hazard" as defined in TSCA. Because EPA misreads the plain language of TSCA, dismissal of this claim should be denied.

Section 7(a) of TSCA, 15 U.S.C. §2606, authorizes EPA to file suit "against any person who manufactures, processes, distributes in commerce, or uses, or disposes of, an imminently hazardous chemical substance or mixture." Under section 7(a)(2) of TSCA, if EPA "has not made a rule under section [6(a)] immediately effective" as authorized by section 6(d)(3)(A), it "shall" commence a suit for immediate injunctive relief where the substance at issue is "imminently hazardous."  Because TSCA states that such suits "shall" be brought for "imminently hazardous" chemicals, filing these actions is a non-discretionary duty of EPA and is enforceable in citizens' suits under TSCA section 20(a)(2).

EPA suggests that, because "no pertinent proposed Section [6] rule even exists . . . no related obligation" to issue an immediately effective rule "could have arisen under Section [7]." EPA Mot. at 13 n.5. But section 7 does not condition EPA's duty to file a section 7 action on the

---

[18] As the Court is aware, plaintiffs plan to file a summary judgment motion seeking a declaration that EPA is in violation of its non-discretionary duties under section 4(f). Should the Court grant the motion, plaintiffs envision that the next step would be briefing on the appropriate remedy for EPA's violation of TSCA.

existence of a proposed rule under section 6(a). Rather, that duty is triggered where EPA has "not made a rule . . .immediately effective." It would be a bizarre result if EPA had a duty to bring a section 7 action when a section 6(a) rulemaking is already underway but not where it has taken no action at all against the imminent hazard. This would negate the Court's ability to compel EPA action against a serious and immediate risk of harm in the very situation where judicial intervention is most needed to protect the public.

The pre-suit notification requirements for suits to enforce non-discretionary duties under section 20(b)(2) refer specifically to the "failure of the Administrator to file an action under section 7." They also shorten the pre-suit waiting period for suits to compel such actions to 10 days rather than the 60 days required for all other TSCA mandatory duty claims. It is thus apparent that Congress attached particular urgency to speedy resolution of suits seeking expeditious action under section 7 and did not want to delay such cases from reaching the courts. This only makes sense if Congress understood that EPA had a mandatory duty under section 7 to bring suits to address imminent hazards

In fact, the Conference Report for the 1976 law explicitly confirms this understanding:

If the Administrator has not used the authority provided in section 6(d)(2)(A)(i) to make a section 6 (a) rule immediately effective in order to protect against an imminently hazardous substance or mixture, *the Administrator must bring an action under section 7. The conferees have imposed such a nondiscretionary duty upon the Administrator to insure that protection is provided against imminently hazardous substances, mixtures, and articles containing such substances and mixtures. (*Emphasis added)

H.R. Report No. 94-1679 at 78. In the face of authoritative legislative history and statutory language, EPA's efforts to deny that section 7 creates a non-discretionary duty are untenable.[19]

---

[19] EPA also argues that section 7 does not create a mandatory duty because "it contains no date-certain deadline by which EPA must take specified action." EPA Mot. at 13 n. 5. However, as described above, cases consistently hold that the word "shall" is the hallmark of a non-discretionary duty. Here the existence of such a duty is clear from the statutory text and legislative history of TSCA. Moreover, "[a] statute may create a non-discretionary duty by setting forth a date certain by which an agency must

Plaintiffs' Complaint also alleges facts that demonstrate a mandatory duty under section 7 in this case. Section 7(f) defines an "imminently hazardous chemical substance or mixture" as:

> a chemical substance or mixture which presents an *imminent and unreasonable risk of serious or widespread injury to health or the environment*, without consideration of costs or other nonrisk factors. Such a risk to health or the environment shall be considered imminent if it is shown that the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture, or that any combination of such activities, is likely to result in such injury to health or the environment before a final rule under section 2605 of this title can protect against such risk.

(Emphasis added). Since the TSCA definition of "imminent hazard" is remarkably similar to the trigger for action under section 4(f), information meeting the 4(f) risk threshold would warrant a section 7 suit if it also demonstrates the "imminence" of the risk.[20] This is the case here because, as described in plaintiffs' Complaint, EPA has found that PFOA is a human carcinogen which is not safe at any dose, is persistent and builds up in human blood, and puts millions of people at risk because of their exposure to fluorinated containers. Again, the Conference Report for the 2016 law is instructive:

> The conferees wish to note that while the unreasonable risk of injury must be imminent, the physical manifestations of the injury itself need not be. Rather, an imminent hazard may be found at any point in the chain of events which may ultimately result in injury to health or the environment. The observance of actual injury is not essential to establish that an

---

comply with an obligation, or *by providing a deadline that is 'readily-ascertainable by reference to some other fixed date or event." Appalachian Voices v. McCarthy,* 989 F.Supp.2d 30,  54 (D.D.C. 2013) (emphasis added). *See also Infracost Inc. v. Blinken,* --- F.Supp.3d ----2024 WL 1914368 (S.D. Cal. April 30, 2024 ("a mandatory duty to act may exist without a mandatory deadline") and *Sierra Club v. Jackson,* 724 F.Supp.2d 33, 43 n.2 (D.D.C. 2010)  ("While a date-certain deadline is necessary to find a nondiscretionary duty, . . . the Circuit Court in *Thomas* twice noted the caveat that 'a nondiscretionary duty of timeliness may arise even if a deadline is not explicitly set forth in the statute, if it is readily-ascertainable by reference to some other fixed date or event.'") Here, guideposts for setting a deadline for EPA to file an imminent hazard action can be found in the shortened 10 day waiting period under section 20(b)(2) for bringing a mandatory duty case for an imminent hazard and the 180-day deadline for taking action in response to section 4(f) information.

[20] Because of the imminence of the risk, the section 21 petition filed by plaintiffs and five other groups requested that EPA issue an immediately effective rule under section 6(d)(3)(A)(i)(I), a request that EPA ignored. The wording of this provision, like that of section 7(f), requires a showing that the chemical at issue "is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before" a rule promulgated under the normal section 6(a) rulemaking process could become effective.  The similar wording of the two provisions demonstrates that they both require immediate action by EPA (either administratively or judicially) where the normal rulemaking process would not prevent serious or widespread harm from occurring.

imminent hazard exists. The conferees intend that action under the imminent hazard action
be able to occur early enough to prevent the final injury from materializing.

H.R. Report No. 94-1679 at 78.  Here too, the risks from fluorinated containers are "imminent"

because exposure to PFAS in these containers will initiate a "chain of events" that will later lead to

serious and widespread harm from cancer and other health effects caused by PFOA.

In sum, the allegations in plaintiffs' Complaint demonstrate both an "imminent hazard" and

a non-discretionary duty by EPA to file a section 7 suit to address that hazard in the absence of an

immediately effective rule under section 6(d)(3)(A). Accordingly, EPA's claim that the Complaint

fails to allege violation of a non-discretionary duty under section 7 must be rejected.

## CONCLUSION

For the foregoing reasons, EPA's motion to dismiss should be denied and the Court should

set a briefing schedule for plaintiffs' impending motion for summary judgement.

Dated: October 11, 2024

Respectfully submitted,

*/s/ Robert M. Sussman*
Robert M. Sussman
SUSSMAN &
ASSOCIATES
DC BAR NO. 226746
3101 Garfield Street,
NW Washington, DC
20008
(202) 716-0118
bobsussman1@comcast.net

*Attorneys for Plaintiff Center for Environmental Health*

*/s/PaulaDinerstei*
Paula Dinerstein
General Counsel
PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY
DC BAR NO. 333971

30

962 Wayne Avenue,
Suite 610, Silver Spring,
MD 20910
202-265-7337
pdinerstein@peer.org

Colleen E.Teubner
DC BAR NO.
90003410
Staff Attorney
Public Employees for Environmental
Responsibility
962 Wayne Ave, Suite 610
Silver Spring, MD
20910
cteubner@peer.org
(202) 464-2293

*Attorneys for Plaintiff Public Employees for Environmental
Responsibility*